# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-2911

_____

| | | |
|---|---|---|
| Fernando Chapa, Individually and as Guardian of Dakota C. Fuller, a minor; Valerie Chapa, Individually and as Guardian of Dakota C. Fuller, a minor, | * * * * * * | |
| Appellants, | * * | Appeal from the United States District Court for the |
| v. | * * | District of Nebraska. |
| United States of America, | * * | |
| Appellee. | * | |

_____

Submitted: March 13, 2007
Filed: August 16, 2007

_____

Before COLLOTON, BEAM and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Fernando and Valerie Chapa, individually and as guardians of Dakota C. Fuller ("Dakota"), sued the United States of America alleging that it was legally responsible, through its employees, for permanent injuries Dakota suffered after being shaken by his biological father. The Chapas alleged that three physicians at a United States military hospital, including Dr. Richard F. Garri, were negligent and caused Dakota's

injuries. After a bench trial, the district court[1] held that the two other physicians did not deviate from the generally recognized medical standard of care but that Dr. Garri's failure to review Dakota's medical records during an emergency room visit constituted a deviation from the medical standard of care. However, the district court held that Dr. Garri's deviation was not the proximate cause of Dakota's injuries and entered judgment in favor of the United States. The Chapas only challenge the district court's decision that Dr. Garri's deviation was not the proximate cause of Dakota's injuries. For the reasons discussed below, we affirm.

## I.    BACKGROUND

Dakota was born on August 3, 2001. Medical personnel at Ehrling Bergquist Hospital ("Bergquist") on the Offutt Air Force Base in Nebraska treated Dakota on six occasions between his birth and December 2, 2001. The Chapas base this suit on four of these visits. On September 25, 2001, Dakota's parents brought him to the emergency department at Bergquist after his mother accidentally gave him a ten-fold overdose of Sudafed. Dr. Lyle J. VanderSchaaf called the poison control center, observed Dakota for two hours, and released him to his parents. On October 5, 2001, Dakota's parents took him for a routine, well-baby check-up. Nurse Practitioner Lynn Murphy inquired as to the cause of a small bruise on Dakota's forehead. His parents stated that most likely a toddler at Dakota's daycare inflicted the bruise. On October 12, 2001, Dakota's father brought him to the emergency department, claiming that he had jerked Dakota by the left arm while trying to lift him. Dr. Garri diagnosed Dakota with "nursemaid's elbow." Dakota's father told Dr. Garri that Dakota had no medical history, and Dr. Garri did not request Dakota's medical records. After an x-ray of Dakota's left arm did not detect any fractures, Dr. Garri released Dakota to his father.

---

[1]The Honorable Laurie Smith Camp, United States District Judge for the District of Nebraska.

On December 2, 2001, Dakota's father again brought Dakota to the Bergquist emergency department. Upon his arrival at the hospital, Dakota had no pulse and was not breathing. After the emergency department personnel resuscitated and stabilized Dakota, they transferred him to Children's Hospital of Omaha ("Children's Hospital"). At Children's Hospital, the physicians diagnosed Dakota as having "shaken-baby syndrome" and determined that Dakota suffered brain trauma the day before arriving at Children's Hospital. As a result of these injuries, Dakota has severe permanent brain damage, blindness and seizures.

In connection with the events of December 2, 2001, Dakota's father pled no contest to a charge of attempted felony child abuse and received eighteen months' probation. Fernando and Valerie Chapa, Dakota's grandparents, took custody of Dakota upon his release from Children's Hospital and later adopted him. In August 2004 the Chapas filed a complaint against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 et seq., for negligence, carelessness and medical malpractice for the failure of the Bergquist medical personnel to diagnose and treat child abuse.

During a bench trial, Dr. John A. Tilelli, the Chapas' expert medical witness, testified that, in his opinion, the care provided during all three of Dakota's visits to Bergquist before the December 2, 2001 incident fell below the generally recognized medical standard of care. Specifically, with respect to the treatment by Dr. Garri, Dr. Tilelli testified that all medical practitioners have a duty to review all medical data available to them, and Dr. Garri deviated from this medical standard of care. Dr. Donald Uzendoski, the United States' expert medical witness, testified that while a patient's medical history must be obtained, there is generally no requirement to obtain the entire medical record when a patient visits the emergency department.

The district court also considered evidence concerning whether Dr. Garri's failure to review Dakota's records was the proximate cause of Dakota's injuries. Dr.

Vandershaaf testified about the standard procedure for reporting suspected child abuse at Bergquist. A physician normally contacts the Family Advocacy Office ("Family Advocacy") with his or her suspicions of child abuse. Based on the severity of the report, Family Advocacy personnel either report to the emergency department immediately or schedule a consultation within one week. Although the record does not reflect that Dr. Tilelli ever worked with Family Advocacy, he testified "based on a reasonable degree of medical certainty" that reporting Dakota's previous injuries to Family Advocacy would have prevented his latest injuries and that if there had been effective intervention, Dakota's father "more likely than not" would not have shaken Dakota on December 2, 2001. In addition, Mrs. Chapa testified that if she had known of Dakota's three hospital visits and had suspected child abuse, she would have "done everything in her power to have taken care of [him]" and sought custody of him. The district court, however, excluded Mrs. Chapa's testimony, sustaining the United States' relevance objection.

The district court held that all medical personnel who treated Dakota acted within the generally recognized medical standard of care, with the exception of Dr. Garri in connection with Dakota's elbow injury. The district court found that Dr. Garri did not act within the medical standard of care when he failed to request and review Dakota's medical records which were located 100 yards from the emergency department and which he could have retrieved in five minutes. Given the ready accessibility of the records and the nature of the injury for which Dr. Garri treated Dakota, the district court found that Dr. Garri deviated from the medical standard of care in that respect.

The district court then concluded that the Chapas failed to prove by a preponderance of the evidence that Dr. Garri's failure to review Dakota's records was the proximate cause of Dakota's injuries because they did not present evidence that Dr. Garri would have done anything beyond reporting any suspicion to Family Advocacy or that, if reported, Family Advocacy would have taken steps sufficient to

-4-

prevent Dakota's injuries. Without any testimony as to what course of action Family Advocacy would have taken after receiving a report from Dr. Garri, the district court held that there was only "wishful speculation" as to whether any action by Family Advocacy would have prevented the injuries. Finding that the Chapas did not prove proximate cause by a preponderance of the evidence, the district court entered judgment for the United States. The Chapas then filed a motion for a new trial or, in the alternative, to alter or amend the judgment, arguing that Dr. Tilelli's testimony satisfied their burden of proof. The district court denied this motion and reaffirmed its holding.

## II.    DISCUSSION

On appeal, the Chapas argue that the district court erred in utilizing the "but for" test in its proximate cause determination and in concluding that the Chapas did not satisfy their burden of proving proximate cause. Because of this incorrect holding, the Chapas argue that the district court improperly denied their post-trial motion for a new trial or, in the alternative, to alter or amend the judgment. We review a district court's denial of this post-trial motion for an abuse of discretion. *Dairy Farmers of Am., Inc. v. Travelers Ins. Co.*, 391 F.3d 936, 943 (8th Cir. 2004). "An abuse of discretion will only be found if the district court's judgment was based on clearly erroneous factual findings or erroneous legal conclusions." *Margolies v. McCleary, Inc.*, 447 F.3d 1115, 1125 (8th Cir. 2006) (quotation omitted). For the following reasons, we find that the district court did not abuse its discretion in denying the Chapas' post-trial motion.

### A. Proximate Cause Test

When a plaintiff alleges professional negligence in a medical malpractice claim, he must "demonstrate the generally recognized medical standard of care, that there was a deviation from that standard by the defendant, and that the deviation was the

proximate cause of the plaintiff's alleged injuries." *Snyder v. Contemporary Obstetrics & Gynecology*, 605 N.W.2d 782, 791 (Neb. 2000).[2] The plaintiff must prove each element by a preponderance of the evidence. *Id.* Since this appeal only concerns the district court's determination that Dr. Garri's deviation from the generally recognized medical standard of care was not the proximate cause of Dakota's injuries, we need not address the first two elements. Instead, we must determine whether the Chapas proved by a preponderance of the evidence that Dr. Garri's deviation was the proximate cause of Dakota's injuries.

Under Nebraska law, courts use one of two tests when analyzing proximate cause. Under the "but for" test, a plaintiff establishes proximate cause when he proves "(1) that without the negligent action, the injury would not have occurred, commonly known as the 'but for' rule; (2) that the injury was a natural and probable result of the negligence; and (3) that there was no efficient intervening cause." *Stahlecker v. Ford Motor Co.*, 667 N.W.2d 244, 254 (Neb. 2003). Nebraska courts use another test, the "substantial factor" test, when the "but for" test allows each defendant to escape responsibility because "the conduct of one or more others would have been sufficient to produce the same result." *Reimer v. Surgical Servs. of the Great Plains, P.C.*, 605 N.W.2d 777, 781 (Neb. 2000) (quotation omitted).

> [T]he substantial factor test harmonizes with Nebraska law regarding proximate cause when multiple causes act to produce a single injury or when the active negligence of a third person is also a substantial factor in bringing about the harm . . . because when there are multiple causes to an injury, liability could never be established under the standard ["but for"] proximate cause instruction.

---

[2]When a plaintiff brings a claim against the United States under the Federal Tort Claims Act, the controlling law is that of the state in which the act or omission occurred. 28 U.S.C. § 1346(b); *Budden v. United States*, 15 F.3d 1444, 1449 (8th Cir. 1994). All events giving rise to this action occurred in Nebraska; therefore, Nebraska law controls. *See id.*

*Id.* Under the "substantial factor" test, a defendant's conduct is a proximate cause of the result "if it was a substantial factor in bringing it about." *Smith v. Colo. Organ Recovery Sys., Inc.*, 694 N.W.2d 610, 623 (Neb. 2005).

The Chapas argue that the district court erred in utilizing the "but for" test instead of the "substantial factor" test to determine whether Dr. Garri's negligence was a proximate cause of Dakota's injuries.[3] They contend that under the "but for" test, a physician will always escape liability for failing to diagnose and report child abuse because the abuse inflicted by parents or other individuals will supercede any negligence by the physician.

We review the district court's interpretation of state law de novo. *Neb. Plastics, Inc. v. Holland Colors Ams. Inc.*, 408 F.3d 410, 419 (8th Cir. 2005). While the Chapas argue for the application of the "substantial factor" test to these facts so physicians will not always escape liability, Nebraska courts have declined to apply the "substantial factor" test to a case merely because it involves multiple parties. *See, e.g., Smith*, 694 N.W.2d at 623. In *Smith*, after a donated liver failed, the recipient sued the surgeon who removed the liver from the donor, the surgeon's employer, and a transport agency. The Nebraska Supreme Court specifically decided that a

_____

[3]We disagree with the United States' argument that the district court actually employed the "substantial factor" test in its analysis. The district court stated in its opinion that it "must consider whether [Dr. Garri's] failure to review Dakota's records was *the* proximate cause of Dakota's injuries." (Emphasis added.) It then cited to Nebraska cases that used the standard "but for" test. *See Hamilton v. Bares*, 678 N.W.2d 74 (Neb. 2004) (where the court decided whether a single actor's negligence proximately caused an injury); *Munstermann ex rel. Rowe v. Alegent Health-Immanuel Med. Ctr.*, 716 N.W.2d 73, 87 (Neb. 2006) (where the court used the standard "but for" test to determine whether an injury "reasonably flowed" from the defendants' alleged breach of duty). Based on the district court's analysis, we believe that it applied the "but for" proximate cause test.

substantial factor instruction was not necessary because that case was not "a case in which liability could never be established under the standard ['but for'] proximate cause instruction." *Id.* Instead, the *Smith* court found that the standard "but for" test was appropriate because a cause is proximate if it is one that "produces a result in a natural and continuous sequence *and* without which the result would not have occurred." *Id.* at 624.

In short, the "substantial factor" test would be appropriate only if Dakota's father could escape liability because the conduct of Dr. Garri alone would have been sufficient to cause Dakota's injuries. *See Reimer*, 605 N.W.2d at 781. Instead, the injury clearly would not have occurred without Dakota's father's actions and would not have occurred based solely on Dr. Garri's actions. Furthermore, this is not a case where liability could never be established under the "but for" test, *see Smith*, 694 N.W.2d at 623, because Dakota's father's actions alone are sufficient to establish liability. Instead, the "but for" test allowed the district court to determine whether Dr. Garri's deviation from the medical standard of care caused Dakota's injuries "in a natural and continuous sequence" and whether "the result would not have occurred" absent that deviation. *Id.* at 624. Therefore, we find that the district court properly utilized the "but for" test in determining whether Dr. Garri's deviation from the medical standard of care was the proximate cause of Dakota's injuries.[4]

**B. Proximate Cause Determination**

Proximate cause is a question of fact under Nebraska law when there is "conflicting evidence." *Staley v. City of Omaha*, 713 N.W.2d 457, 466 (Neb. 2006). We review a district court's findings of fact under the clearly erroneous standard. *Id.*

---

[4]We do not find persuasive the Chapas' reliance on the California Supreme Court's decision in *Landeros v. Flood*, 551 P.2d 389, 395-96 (Cal. 1976). California's law concerning proximate cause has no bearing on proximate cause under Nebraska law.

However, we review de novo the legal question of whether there was sufficient evidence to submit an issue to a jury. *Carter v. Kansas City S. Ry. Co.*, 456 F.3d 841, 848 (8th Cir. 2006). In this bench trial, it is unclear from the record whether the district court weighed the conflicting evidence and made a factual determination that the Chapas did not prove proximate cause or whether the district court made a legal determination that the evidence was so insufficient that it need not make a factual determination. Giving the Chapas the most favorable standard of review, we will assume without deciding that the district court made the determination as a matter of law and use the de novo standard of review.

We do not find error in the district court's determination that the Chapas' evidence was insufficient to prove that Dr. Garri's failure to review Dakota's records proximately caused Dakota's injuries. While neither party focuses on the district court's initial step in its proximate cause analysis, the district court first assumed that had Dr. Garri reviewed Dakota's medical records he would have suspected child abuse and contacted Family Advocacy. The district court then found that there was only "wishful speculation" as to how Family Advocacy would have responded to any report of child abuse suspicion. In order to meet their burden of proof, the Chapas had to provide evidence that was "sufficient to make the theory of causation reasonable and not merely possible." *King v. Crowell Mem'l Home*, 622 N.W.2d 588, 594 (Neb. 2001). "Speculation and conjecture are not sufficient to establish causation. . . . [T]here must be something more which would lead a reasoning mind to one conclusion rather than to another." *Id.* In the context of medical malpractice claims, "[m]edical expert testimony regarding causation based upon possibility or speculation is insufficient; it must be stated as being at least 'probable,' in other words, more likely than not." *Neill v. Hemphill*, 607 N.W.2d 500, 505-06 (Neb. 2000).

The Chapas argue that they presented sufficient evidence to prove that had Dr. Garri reviewed Dakota's records, he would have suspected child abuse, reported the suspicion of child abuse to Family Advocacy, and Dakota's father would not have

-9-

injured Dakota. The Chapas contend that they satisfied their burden with Dr. Tilelli's expert medical testimony that had Dr. Garri reported a suspicion of child abuse to Family Advocacy, it was more likely than not that Dakota's father would not have injured Dakota. They also argue that a Family Advocacy employee could not have testified about how Family Advocacy would have responded to a report by Dr. Garri because his or her testimony would have been speculative.

While Dr. Tilelli did testify about what he believed was more likely than not the proximate cause of Dakota's injuries, he never worked with Family Advocacy and was not an expert on Family Advocacy's policies and procedures. Without any competent testimony about how Family Advocacy would have responded to a situation similar to Dakota's, the district court correctly held that there was only "wishful speculation" as to whether Dakota's injuries would have been prevented had Dr. Garri contacted Family Advocacy. Therefore, the district court did not err in its finding that Dr. Garri's negligence did not proximately cause Dakota's injuries.

Finally, the Chapas' argument that the district court erred in excluding Mrs. Chapa's testimony that she would have removed Dakota from his parents if she had known of any of the three hospital visits and had suspected child abuse also fails. "Rulings on admissibility of evidence will not be reversed absent a clear and prejudicial abuse of discretion." *Ahlberg v. Chrysler Corp.*, 481 F.3d 630, 632 (8th Cir. 2007) (quotation omitted). The Chapas did not present any evidence showing that Mrs. Chapa would have been informed of the hospital visits had Dr. Garri reported a suspicion of child abuse to Family Advocacy. Without any such proof, the testimony was speculative and not relevant, and the district court did not clearly abuse its discretion in excluding this testimony. *See* Fed. R. Evid. 402.

## III. CONCLUSION

For the foregoing reasons, we affirm the district court's judgment in favor of the United States.

_____